UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                                    CRIMINAL ACTION NO. 2:22-00154

ANDRE DEWAYNE WILLIAMSON
*Also known as* A3

MEMORANDUM OPINION AND ORDER

Pending before the court are the defendant's Motion for a New Trial (ECF No. 123), filed by his counsel on April 5, 2023, and Motion for Leave to File Amended Motion for New Trial (ECF No. 128), filed by his counsel on April 28, 2023. Also received in chambers are two letter-form pro se motions by the defendant, received on May 2, 2023 and May 3, 2023, which are ORDERED filed herein.

I.   Background

On December 6, 2022, a grand jury in the Southern District of West Virginia returned a six-count superseding indictment against the defendant for distribution of fentanyl on five dates in July 2022, in violation of 21 U.S.C. § 841(a)(1), as well as possession of a firearm in furtherance of a drug

trafficking crime on July 5, 2022, in violation of 18 U.S.C. § 924(c)(1)(A).  ECF No. 52.

On August 2, 2022, the defendant was apprehended by law enforcement officers and taken to the West Virginia State Police barracks in Summersville, West Virginia for questioning by Detective Anthony Thomas of the Charleston Police Department and Metropolitan Drug Enforcement Network.  Upon arrival at the barracks, Detective Thomas reportedly overheard a brief exchange between the defendant and a booking officer, which formed the basis of his subsequent interview of the defendant.  At the outset of the interview, Detective Thomas read the defendant his rights, as required by Miranda v. Arizona, 384 U.S. 436 (1966).  Immediately and without interruption after this, the following exchange occurred:

```
DT:  You understand those rights?
AW:  Yes, sir.
DT:  Okay, having those rights in mind, do you
     want to talk?
AW:  Yes, sir.
DT:  So, here's the thing man.  I... I am going
     to be honest with you.  Straight up.
AW:  Okay.
DT:  I can't get you your phone right now.  I
     cannot, but I can be honest with you and
     tell you ummm... that you have a warrant for
     distribution.
AW:  Okay.
DT:  Okay.
DT:  So...
AW:  Distribution of...
DT:  Uhhh, right now its [indecipherable]
```

```
                    fentanyl.
          AW:   Okay, how much?
          DT:   I can't tell you how much.
          AW:   Okay.
          DT:   You just... You have multiple counts of...
                    okay.
          AW:   Okay.
          DT:   I can't give you an exact...number.
          AW:   Is all this tied to Charleston?
          DT:   What is it?
          AW:   All this tied to Charleston?
          DT:   This is from Charleston.
          AW:   Okay.
          DT:   Alright.  So, let me ask you this.
          DT:   Uhhh, I heard you earlier when you came in
                    here...
          AW:   Yeah...
          DT:   You said if you had something out of
                    Charleston, you don't do much out of
                    Charleston.
          AW:   Yeah...
          DT:   Explain to me what you mean.
          AW:   I mean, I'm not no big time drug dealer, so
                    I know it can't be too much.
          DT:   Okay...
          DT:   Uhhh, you sell a little bit of fentanyl here
                    and there.
          AW:   I don't sell nothing.  I don't know what I'm
                    charged with, but if we could talk, we could
                    talk, ya know what I mean?
          DT:   Well that's what I'm saying.  We are talking
                    right now.  Ya said you don't sell that
                    much...
          AW:   No.
          DT:   But, do you sell a little bit to make ends
                    meet?
          AW:   I don't want to say nothing to incriminate
                    me.
```

Tr. Interview, ECF No. 96-1 at 1-3.

        Notwithstanding this invocation of the right to remain

silent, Detective Thomas continued with the interview, which was

recorded, eventually eliciting further inculpatory statements

from the defendant.  See id. at 3-10.  The defendant moved to
suppress the recorded statement (ECF Nos. 78, 96), which motion
the court denied with respect to that quoted above which
preceded the defendant's response of "I don't want to say
nothing to incriminate me," but granted as to the remainder of
the interview, following a pre-trial evidentiary hearing held on
March 14, 2023.  As reflected on the record of that hearing, the
court directed that the government not introduce into evidence
any part of the August 2, 2022 statement from the point of the
defendant's invocation of his Fifth Amendment right until the
end of the interview.  See Tr. Second Pre-trial Motions Hearing,
ECF No. 133 at 5-6.

On March 21, 2023, a three-day jury trial commenced,
in which the government introduced physical evidence of
narcotics and firearms, video and photographic evidence of the
controlled drug buys, an inculpatory jail call recording, and
testimony from seven witnesses.  See Exh. & Witness List, ECF
No. 120.  These witnesses included a forensic chemist from the
Drug Enforcement Administration's Mid-Atlantic Laboratory, a
confidential informant who engaged in the five monitored
controlled buys of fentanyl from the defendant that are in
evidence, two private citizens who located the subject firearm

in an AirBnB dryer, and three law enforcement officers who participated in the investigation.  Id.

The motion for a new trial is based on the following three trial events to which no objection was made by defendant at trial.

1.

Among the officers testifying at trial was Detective Anthony Thomas.  On direct examination, the following colloquy occurred between Detective Thomas and Assistant United States Attorney Joshua Hanks:

> Q:  Did there come a time when you had an opportunity to ask [the defendant] to clarify what he meant by that it wasn't — if it was out of Charleston, it wasn't too much?
> A:  Yes, sir.
> Q:  Did you go in to speak with him?
> A:  I did, sir.
> Q:  And after being advised of his Miranda rights, did he agree to answer that question that you posed as to what he meant by that he didn't do much out of Charleston?
> A:  He — I posed the question.  And he did not answer the question.
> Q:  Okay.  Did you not ask him for clarification as to what he meant of what you had overheard him say?
> A:  I did ask him for clarification, yes.
> Q:  And did he respond to that?
> A:  He responded that, I believe, that he did not want to incriminate himself.

Tr. Proceedings, Thomas Direct Examination, ECF No. 129 at 2-3.

Immediately following this exchange, the government moved to strike Detective Thomas' statement as non-responsive and objected on behalf of the defendant.  Id. at 3.  Counsel for the defendant made no objection to this.  Id.  The court then responded by instructing the jury: "The jury will disregard the statement that was last made by the witness, strike it, and it's not to be taken into account in any fashion in your deliberations."  Id.

### 2.

Also testifying at trial was Detective Wesley Daniels. On direct examination, Detective Daniels testified about his engagement of the confidential informant who carried out the controlled narcotics purchases from the defendant on behalf of the government.  In particular, Daniels testified about an occasion in which it came to his attention that there was a discrepancy between the amount of money provided to the confidential informant for the purposes of one of the controlled buys from the defendant and the amount of narcotics delivered to law enforcement by the confidential informant following the controlled buy.  Tr. Proceedings, Daniels Direct Examination, ECF No. 134 at 28-31.  Daniels testified that he confronted the confidential informant with the discrepancy, at which point the confidential informant admitted to having taken $400 of the

money provided to him for the purposes of the controlled buy.
Id. at 29.  Daniels testified that he recovered the $400 from
the confidential informant and resolved that the continued
engagement of the confidential informant would be possible only
with the confidential informant's consent to the imposition of a
"complete[] strip-search" before and after any controlled buy.
Id.

At that point, the following colloquy took place
between Detective Daniels and Assistant United States Attorney
Julie White:

> Q:  Why did you keep working with [the
>      confidential informant]?
> A:  Mr. Williamson is one of those guys that it's
>      hard to find somebody to — that actually has
>      the courage to work against him.  So we
>      continued to use Mr. Collins.

Id. at 30.  This will be referred to as the "courage comment."

3.

The government's evidence at trial further included
audiovisual recordings of each of the five controlled drug
transactions that were created by the confidential informant and
shown to the jury during his testimony.  See Gov't Exhs. 1a, 6a,
11a, 14a, 17a.  On direct examination, the confidential
informant was asked questions at various points during the
videos to establish their content.  The video of the third

transaction on July 21, 2022, included an exchange between the defendant and the confidential informant regarding a potential future sale of two "zips" of "cream," that is, two ounces of methamphetamine, to the confidential informant's brother who works in Marmet, West Virginia but lives in Ohio.  Gov't Exh. 14a at 0:43-1:10, 4:53-7:05; see also Tr. Proceedings, Collins Direct Examination, ECF No. 151 at 4-5 (clarifying meaning of "cream" and that the transaction concerned two ounces of narcotics).

In the exchange, the defendant and the confidential informant discussed what price to fix for the sale of these drugs to the brother so as to benefit both the defendant and confidential informant.  Gov't Exh. 14a at 5:42-7:05.  In the course of establishing a sale price to charge the brother, the confidential informant inquired how much the defendant would pay a supplier for the narcotics, to which the defendant responded that "I get it on my face."  Id.  Testimony of the confidential informant at trial established that this meant the defendant was able to procure the drugs without upfront payment to his supplier.  Tr. Proceedings, Collins Direct Examination, ECF No. 151 at 4.

On direct examination of the confidential informant concerning his conversation with defendant to fix a price for a

8

future drug sale to the confidential informant's brother, the
following colloquy took place with AUSA White:

> Q:  And it sounded as though you and the
>     defendant were discussing making a bigger
>     purchase.  You said something about a man from
>     Ohio?
> A:  Yes.  I was setting up a buy for two ounces
>     of slow.
> Q:  And who was going to be a part of that buy
>     with you?
> A:  The detectives.
> Q:  Was the defendant a part of that?
> A:  Yes.

Id. at 5.

In her rebuttal closing argument on the third day of
trial on March 23, 2023, AUSA White sought to draw the jury's
attention to the future drug transaction with the confidential
informant's brother, stating: "So what do we know about the
defendant?  We know he's selling drugs.  We know he's selling
drugs from his home.  We know that he's planning a bigger buy
from a man out of Ohio."  Tr. Proceedings, Closing Argument, ECF
No. 136.

4.

After closing arguments, the court instructed the jury
prior to excusing them for deliberations.  The court's
instructions, formulated with the parties at an instruction
conference on the record and to which no objection was made,

9

directed the jury to disregard any stricken statement.  <u>See</u> "Evidence in the Case" Jury Instruction ("Any evidence as to which an objection was sustained by the court, and any evidence ordered stricken by the court, must be entirely disregarded.").

After approximately three hours of deliberations, the jury returned a verdict of guilty against the defendant on all six counts of the superseding indictment.  Verdict, ECF No. 114. An order was entered the same date adjudging the defendant guilty, informing him of his ability to file post-trial motions within 14 days, and setting sentencing for June 28, 2023.  ECF No. 117.

On April 5, 2023, the defendant, by counsel, timely filed the pending motion for new trial (ECF No. 123), to which the government filed a response in opposition on April 6, 2023 (ECF No. 124), and the defendant filed a reply on April 18, 2023 (ECF No. 125).  On April 28, 2023, the defendant, by counsel, filed the pending motion for leave to file amended motion for new trial.  ECF No. 128.  On June 30, 2023, the court granted defendant, by counsel, leave to file a supplement to his motion for a new trial, which supplement was docketed by the clerk that same day.  ECF No. 140.  The government filed a supplemental response in opposition on July 6, 2023 (ECF No. 143), and the

defendant filed a supplemental reply on July 8, 2023 (ECF No. 146).

Additionally, the defendant, without aid of counsel, sent two letter-form motions to the court, which were received in chambers on May 2, 2023 and May 3, 2023 and ordered filed herewith.  The court will refer to these as the first and second <u>pro</u> <u>se</u> letter-form motions.

## II.   <u>Governing standard</u>

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "Such motions should be awarded sparingly, as a jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against it."  <u>United States v. Gutierrez</u>, 963 F.3d 320, 339-40 (4th Cir. 2020) (quoting <u>United States v. Wilson</u>, 624 F.3d 640, 660 (4th Cir. 2010)).  "A new trial is warranted only 'when the evidence weighs so heavily against the verdict that it would be unjust to enter judgment.'"  <u>United States v. Millender</u>, 970 F.3d 523, 531 (4th Cir. 2020) (quoting <u>United States v. Arrington</u>, 757 F.2d 1484, 1485 (4th Cir. 1985)) (marks omitted). While a district court considering a motion for new trial "must remain cognizant of the demanding standard for jettisoning a

jury verdict in favor of a new trial, the court need not construe all the evidence in the Government's favor and may consider witness credibility." <u>Millender</u>, 970 F.3d at 532.

### III. <u>Discussion</u>

a. Defendant's motion for new trial (ECF Nos. 123, 140)

The defendant contends that a new trial should be ordered under Fed. R. Crim. P. 33(a) because of three asserted instances of prosecutorial misconduct.  First, the defendant asserts prosecutorial misconduct on account of Detective Thomas' testimonial reference to the suppressed portion of the August 2, 2022 interview in which the defendant invoked his Fifth Amendment right to remain silent (the "invocatory statement"). Def.'s Mot. New Trial, ECF No. 123 at 1; Def.'s Supp., ECF No. 140 at 1.  Second, he asserts prosecutorial misconduct on account of Detective Daniels' reference to the difficulty of finding informants with the courage to make controlled purchases from the defendant (the "courage comment"), which defendant contends was improper character evidence under Fed. R. Evid. 404(b) and of which he received no pre-trial notice from the prosecution under 404(b)(3).  Def.'s Supp. at 1-2.  Third, the defendant also asserts prosecutorial misconduct on account of

AUSA White's reference in closing argument to "planning a bigger buy from a man in Ohio" (the "man from Ohio comment"), which he contends was unsupported by the evidence of record in the case. Id. at 2-3.

A new trial may be granted for improper conduct during the prosecution's presentation of its case where "the conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002) (quoting United States v. Morsley, 64 F.3d 907, 913 (4th Cir. 1995)). To succeed, a defendant must show that (1) there were improper conduct or remarks by the prosecution, and (2) the defendant's substantial rights were thereby prejudicially affected so as to deprive him of a fair trial. Scheetz, 293 F.3d at 185.

The court first observes, as the government did at trial, that Detective Thomas' statement referencing the defendant's invocation of the right not to incriminate himself was within the scope of the statements that the court directed be suppressed. As set forth on the record of the court's pre-trial motions hearing held March 14, 2023, Detective Thomas was present for this hearing and counsel for the government had an obligation to ensure their witness understood and was prepared to comply with the court's order prior to trial.

On the question of prejudice, the Fourth Circuit has identified a non-exhaustive list of six relevant factors to guide a court's analysis.  Namely: (1) the degree to which remarks had a tendency to mislead the jury and to prejudice the defendant; (2) the isolation or extensiveness of the remarks; (3) "the strength of the component proof introduced to establish the guilt of the defendant" absent the remarks; (4) the deliberateness of the remarks; (5) the degree to which remarks were invited by the defense; and (6) the giving of a curative instruction of the jury.  Id. at 185-86 (citing United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998)).

While it is true that Detective Thomas' statement had a tendency to prejudice the defendant and this was in no way invited by the defense, the remaining Scheetz factors weigh heavily against a finding of prejudice here.  To start, the improper statement from Detective Thomas amounted to an isolated, single sentence from a single witness that did not itself constitute a specific admission of misconduct by defendant.  This occurred during a three-day jury trial in which the jury heard from seven witnesses for the prosecution that included an incriminating jail call by the defendant. Additionally, in the motion signed by counsel, the defendant makes no suggestion that Detective Thomas' statement was

deliberate, nor did the statement appear, on its face, to be a result of anything other than inadvertence or confusion on the part of the witness.  To be sure, the defendant's <u>pro</u> <u>se</u> second letter-form motion does contend that Thomas made the statement after "seeing how the trial was not going in the favorite [sic] of his case[,]" but this unsupported assertion is based on mere conjecture of the defendant that the court discerns no reason to credit.

Further, the government's evidence of the defendant's guilt in this case was otherwise overwhelming.  It included testimony of eyewitnesses to each of the five drug transactions, audiovisual recordings of each of the five drug transactions, testimony of a forensic expert as to the laboratory analysis of the drugs purchased in each of the five transactions, physical evidence of the drugs purchased in each of the five transactions, and physical evidence of a firearm and ammunition possessed in furtherance of one of the drug transactions.  Most damningly, the jury was presented with a jail call in which the defendant himself admitted to the drug transactions.  The great weight of this proof, which was appropriately admitted and before the jury for its consideration, all but precludes a finding that the defendant was sufficiently prejudiced by

Detective Thomas' improper reference to the suppressed statement as to merit a new trial.

Finally, the improper statement was immediately addressed by a curative instruction from the court that jurors were to disregard the foregoing statement.  <u>See</u> Tr. Proceedings, ECF 129 at 3 ("The jury will disregard the statement that was last made by the witness, strike it, and it's not to be taken into account in any fashion in your deliberations.").  Prior to being excused for deliberations, jurors were once more instructed by the court that the stricken statement was not to be considered.  <u>See</u> "Evidence in the Case" Jury Instruction ("Any evidence as to which an objection was sustained by the court, and any evidence ordered stricken by the court, must be entirely disregarded.").

"[S]ave for extraordinary situations, [courts] adhere to the crucial assumption that jurors carefully follow instructions."  <u>United States v. Rafiekian</u>, 991 F.3d 529, 550 (4th Cir. 2021) (quoting <u>Francis v. Franklin</u>, 471 U.S. 307, 324–25 n.9 (1985)) (internal marks and cites omitted).  As such, courts ought only grant a new trial notwithstanding an instruction to the jury where there is "specific reason to doubt that the jury followed the directions it was given."  <u>Id.</u> (citing <u>United States v. Runyon</u>, 707 F.3d 475, 497 (4th Cir.

2013)).  Where there is no suggestion that the jury's adherence to the court's instruction can be called into doubt, this Scheetz factor independently weighs heavily against granting a new trial.

Having weighed the Scheetz factors, the court concludes that the defendant has failed to show that Detective Thomas' improper reference to the suppressed statement was sufficiently prejudicial so as to warrant a new trial under Rule 33(a).

Turning next to the courage comment by Detective Daniels on direct examination by the government.  In assessing the propriety of this comment, the court notes the context in which it arose.  From early on, the government was aware of potentially damaging impeachment evidence regarding the key witness in its case, the confidential informant, relating to his theft of $400 given to him by law enforcement for the purpose of completing a controlled buy on one occasion.  See Tr. Proceedings, First Pre-Trial Motions Hearing, ECF No. 87 at 12-14.  This evidence also had the potential to discredit the judgment of another government witness, Detective Daniels, who was responsible for managing law enforcement's relationship with the confidential informant.

Perhaps as a matter of trial strategy, the government chose to raise the confidential informant's $400 theft for the first time in direct examination of Detective Daniels.  Tr. Proceedings, Daniels Direct Examination at 28-30.  After Daniels explained the theft, the government sought to mitigate any potential damage to Daniels' judgment by asking him to explain his continued engagement of the confidential informant even after discovering the theft.  Id. at 31.  Daniels responded with the courage comment.  Id.

The defendant asserts that the only logical inference to be drawn from the courage comment is that the defendant is a dangerous or violent person and that the reference to courage is therefore character evidence under Fed. R. Evid. 404(b) whose admission was improper.  Def.'s Supp. at 2.  He further asserts that the courage comment was improper on account of the government's failure to provide the defendant with notice of its intent to introduce it as required by Fed. R. Evid. 404(b)(3). Id.  In response, the government disputes that the courage comment amounts to improper character evidence, arguing that instead of being addressed to the character of the defendant, the courage comment was addressed to the character of the confidential informant.  Gov't Resp. at 8.

The court notes that while the parties discuss whether
the courage comment amounts to improper character evidence,
which is governed by Rule 404(a), the defendant has quite
clearly asserted that he contends this comment ran afoul of Rule
404(b).  <u>See</u> Def.'s Supp. at 2; Def.'s Reply to Gov't Supp.
Resp., ECF No. 146 at 1.  Under the heading "Other Crimes,
Wrongs, or Acts," Rule 404(b) prohibits the admission of
evidence of another "crime, wrong, or other act . . . to prove a
person's character in order to show that on a particular
occasion the person acted in accordance with the character."
Fed. R. Evid. 404(b)(1).  The Rule allows the admission of
evidence of other acts or crimes if used to prove a purpose
other than the defendant's acting in conformity with the
character trait on a particular occasion.  <u>Id.</u> at (b)(2); <u>United
States v. Brizuela</u>, 962 F.3d 784, 793 (4th Cir. 2020).

The government's characterization that Detective
Daniels' courage comment reflects a statement on the
confidential informant' character trait of courageousness, is
incomplete.  <u>See</u> Gov't Supp. Resp. at 8.  The courage comment
reflects two distinct ideas.  The first half of the courage
comment, "Mr. Williamson is one of those guys that it's hard to
find somebody," reflects commentary on the defendant and his
reputation alone, while the second half of the courage comment,

"it's hard to find somebody to – that actually has the courage to work a case against him," reflects commentary on the character of the confidential informant and the reputation of the defendant.  At the very least, the courage comment concerns the defendant's character.

Nevertheless, the defendant's argument suffers two fatal infirmities.  First, the defendant has not shown any reason why the courage comment falls within the scope of Rule 404(b) inasmuch as it reflects no evidence of a crime, wrong, or act on the part of the defendant.  Second, even if the courage comment could be said to fall within the scope of Rule 404(b), and assuming the correctness of defendant's assertion that it can only be understood as a commentary on defendant's character for dangerousness or violence, the courage comment was not being used to establish the defendant's acting in conformity with either such character trait.  Rather, the defendant's display of a firearm in connection with one of the five fentanyl sales taking place in the defendant's residence was sufficient to justify the courage comment.  To the extent that there was purpose behind Daniels' limited reference to the defendant's character, this was plainly being used by the prosecution for the purpose of addressing Detective Daniels' motive for continuing to engage the services of the confidential informant

after discovering his theft of $400.  Accordingly, the court ascertains no impropriety in the courage comment stemming from Rule 404(b)(1).[1]

The defendant's other asserted impropriety related to the courage comment is that the government failed to provide him with pre-trial notice of its intended use of Rule 404(b) evidence and an articulation of the permitted purpose for which it was to be offered, as required by Rule 404(b)(3).  Inasmuch as the courage comment does not constitute other acts evidence, the prosecution's failure to provide notice does not amount to prosecutorial misconduct.

Lastly, the court turns to the man from Ohio comment by AUSA White in her rebuttal closing argument.  AUSA White's statement that "[w]e know that [defendant]'s planning a bigger buy from a man out of Ohio" could have been naturally understood in two ways.  On the one hand, this comment could be understood to suggest that the defendant was planning a future purchase of narcotics from a supplier in Ohio.  On the other hand, viewing this comment as reflecting more colloquial language in speaking to the jury, it could be understood to suggest that the

---

[1] In light of the purpose behind this limited reference to the defendant's character, the court's conclusion would be the same had defendant raised this argument under Rule 404(a).

defendant was planning a future drug buy from, that is, a drug sale to, a man in Ohio.  The defendant's argument is premised upon the first interpretation.  See Def.'s Supp. at 2-3.

The video recording of the July 21, 2022 controlled drug buy and the testimony of the confidential informant thereupon plainly reflect that the defendant's role in the future transaction with the man from Ohio was as a seller of two ounces of narcotics, rather than as a buyer.[2]  In that respect, if the defendant's interpretation of the man from Ohio comment is correct, then AUSA White's representation of his planned role in that future transaction was inaccurate, although the rest of the comment was substantially supported by the evidence.  That is, the defendant did conspire with the confidential informant to arrange a future drug transaction with a man from Ohio in a substantially larger quantity than the 19 grams of fentanyl distributed during the five transactions for which defendant was indicted.

Assuming the correctness of defendant's interpretation of the meaning of the man from Ohio comment, and assuming

---

[2] There is a discrepancy between the video and testimony of the confidential informant as to whether the sale was to be for two ounces of a heroin/fentanyl mix ("slow") or methamphetamine ("cream"), although the court sees no significance to it, nor has any argument to that effect been raised by the parties.

further that the misrepresentation of the defendant's role in the future drug transaction was sufficient to render the statement unsupported by the evidence notwithstanding its substantiation in all other respects, the defendant would satisfy the first prong of the prosecutorial misconduct test. Nevertheless, the defendant cannot show that he was prejudiced so as to satisfy the second prong.

In considering the Scheetz factors, the court assumes the correctness of the defendant's interpretation of the meaning of the man from Ohio comment.  This was a single isolated comment, and there is no indication of a deliberate attempt to misrepresent the evidence on the part of the prosecution.  More importantly, to the extent of any unsupported representation, the man from Ohio comment would have no more than a de minimis tendency to mislead the jury.  The evidence reflects that the defendant was conspiring with the confidential informant to set up and fix the price for a future sale of a larger-than-usual quantity of narcotics to the informant's brother from Ohio.  It would be readily clear to any reasonable juror that the defendant would need to purchase these narcotics from a supplier in order to then subsequently sell them to the man from Ohio. The evidence also reflects that the defendant did make purchases for supply inasmuch as he stated he was able to procure

narcotics for distribution without upfront payment.  Thus, if the government's man from Ohio comment means what the defendant says it does, the jury could only have been misled on the exceedingly minor point of the defendant's role as buyer or seller in the specific circumstances of the future drug transaction with the man from Ohio.

In any event, if the jury was so misled, the court cannot ascertain any prejudice to the defendant inasmuch as it reminded the jury of only the defendant's planned procurement of narcotics for distribution, whereas an accurate representation of the defendant's role in the future drug transaction reflected in the evidence would have called to the jury's attention his planned distribution of the narcotics and, by implication, his procurement of those narcotics for distribution.

The court notes that any misrepresentation by the government was neither invited by the defense or the subject of an objection by the defense nor did the defendant request an instruction to the jury on it.  However, the court draws on its prior discussion of the overwhelming evidence of guilt in this case to conclude that the Scheetz factors point convincingly to the inappropriateness of a new trial on account of the man from Ohio comment.

Having considered each asserted trial error independently, the court addresses whether the impropriety of Detective Thomas' reference to the invocatory statement and any impropriety associated with the government's failure to provide pretrial notice of the courage comment or AUSA White's man from Ohio comment in closing arguments is sufficiently prejudicial in its accumulation as to warrant a new trial.  The court incorporates its prior discussion of the overwhelming evidence of guilt in this case and concludes a new trial is not merited under Fed. R. Crim. P. 33(a).

b. Defendant's amended motion

The court notes that the defendant's motion for leave to file an amended motion for new trial is sought for the sole purpose of including a previously omitted request for a hearing upon the motion.  <u>See</u> Def.'s Mot. Leave, ECF No. 128.  Inasmuch as the facts appear on the record of the trial and inasmuch further as the applicable law has been briefed by the parties, the court finds that a hearing on the issue would not aid the decisional process.  Consequently, the defendant's motion for leave to file an amended motion for new trial is granted, but the amended motion for new trial that simply requests a hearing is denied.

### c. Defendant's first letter-form motion

Defendant's first letter-form motion contains four paragraphs and seeks a new trial on the basis of Detective Thomas' reference to the suppressed statement.  Inasmuch as the letter proceeds on the same basis as that of the motion for new trial filed by counsel, it is denied for the same reasons.

### d. Defendant's second letter-form motion

Defendant's second letter-form motion contains three paragraphs, each concerning a different asserted trial error. The first and second paragraphs recite impeachment evidence thoroughly aired at trial about two witnesses for the prosecution, and neither paragraph makes any request for relief. The third paragraph restates the defendant's grievance regarding Detective Thomas' reference to the suppressed statement and closes with the letter's only discernible request for relief: "Just asking for a Date to Be set on this mater [sic, matter.]" The court construes this to be a request for a hearing upon the defendant's motion for new trial.  Inasmuch as this letter seeks the same relief as that of the amended motion for new trial filed by counsel, it is denied for the same reasons.

IV.   <u>Conclusion</u>

In accordance with the foregoing discussion, it is ORDERED that:

1.  Defendant's motion for new trial be, and hereby is, denied;

2.  Defendant's motion for leave to file an amended motion for new trial be, and hereby is, granted;

3.  Defendant's amended motion for new trial be, and hereby is, denied;

4.  Defendant's letter-form motion for new trial be, and hereby is, denied; and

5.  Defendant's letter-form request for hearing on the motion for new trial be, and hereby is, denied.

The Clerk is directed to forward copies of this order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

ENTER: September 5, 2023

John T. Copenhaver, Jr.
Senior United States District Judge