UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


UNITED STATES OF AMERICA


v.                          CRIMINAL ACTION NO. 2:22-00154


ANDRE DEWAYNE WILLIAMSON,
*also known as* A3


### MEMORANDUM OPINION AND ORDER


        Pending is defendant's Motion for Indicative Ruling on

Motion for New Trial.  ECF No 193 (filed Dec. 7, 2023) ("Mot.").

The Government has filed a response opposing the motion, ECF No.

195 ("Resp."), to which defendant has replied, ECF No. 196

("Reply"), and later supplemented his reply, ECF No. 197 ("Supp.

Reply").


        In this case, a superseding indictment set forth

several charges against defendant on December 6, 2022.  See ECF

No. 52.  Defendant was tried before a jury and convicted on all

counts on March 23, 2023.  See ECF No. 117.  Defendant filed a

Motion for New Trial, which the court denied by order entered on

September 5, 2023.  <u>See</u> ECF No. 123 (motion), 165 (order).  On September 22, 2023, defendant filed notice of appeal.  <u>See</u> ECF No. 178.  The Court of Appeals for the Fourth Circuit relieved trial counsel and appointed new counsel to prosecute the appeal.  <u>See</u> ECF No. 182.  The Fourth Circuit now has jurisdiction over this matter and its case number is 23-4601.

## I.   Background

"While preparing the appeal," defendant's appellate counsel discovered new evidence which defendant argues requires a new trial based on a juror issue that gives rise to factual and legal grounds separate and distinct from defendant's original motion for new trial.  Mot. at 2.  Upon the appellate's unopposed motion for a limited remand, the Court of Appeals, by Order entered May 14, 2024, "remands this case to the district court for the limited purpose of allowing the district court to rule on the limited issue raised in the Motion for Indicative Ruling on Motion for New Trial."

Federal Rule of Criminal Procedure 37 provides, in relevant part:

> (a)  If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:
>
> >  1. Defer considering the motion;
> >
> >  2. Deny the motion; or
> >
> >  3. State either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Crim. P. 37(a).  To prevail on a motion for new trial based, as here, on juror dishonesty, a party must:  1) "demonstrate that a juror failed to answer honestly a material question on voir dire," and 2) "show that a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984).


Defendant argues that the first prong is met by two instances of a juror's dishonesty during voir dire, each of which, defendant claims, would have provided a valid basis for a challenge for cause if truthful answers had been given.  See Mot. at 6-9.  First, defendant asserts that the juror, Carl David Rockel, was dishonest by referring to himself as a retired police chief.  Id. at 7.  As evidence received at the

3

evidentiary hearing herein beginning on January 16, 2025, shows, the juror did retire as Chief of Police for the City of Williamson, where he served in that capacity for two years, on June 30, 2013, but he remained in his position as Chief Field Deputy with the Mingo County Sheriff that began in January 2013 and continued until being fired from that position on September 19, 2013.  Second, defendant asserts the juror was dishonest by responding that the juror had never been "involved [with] any conflict, controversy, or litigation with any department or agency of the United States," despite having received a target letter from the Office of the United States Attorney, and entering into a Proffer Agreement with the United States Attorney's Office regarding a federal investigation into corruption while the juror was employed as Williamson's Chief of Police and as Chief Field Deputy in the Mingo County Sheriff's Department.  See id.;  Reply at 5.

The defendant contends that complete and correct responses to those questions would have provided a valid basis for a challenge for cause.  See Mot. at 8.

Having reviewed the parties' briefing and exhibits, the court FINDS that, pursuant to Federal Rule of Criminal Procedure 37(a), Defendant's Motion for Indicative Ruling on

Motion for New Trial "raises a substantial issue" as to whether the juror was dishonest during voir dire such that defendant was deprived of an opportunity to challenge the juror for cause and, if so, whether a new trial is warranted.

Inasmuch as further proceedings in the district court could clarify the matter, the court conducted the evidentiary hearing above noted, beginning January 16, 2025, and continuing on January 30, 2025, followed by briefing by the defendant and the United States, of which the initial brief by the defendant is instead labelled by him as a "Motion for New Trial" filed as ECF 283.

The court makes the following Findings of Fact by a preponderance of the evidence, along with its Conclusions of Law.

## II. Findings of Fact

In the 2012-13 period, Mingo County, West Virginia, was plagued with scandal and public corruption under the leadership of Michael Thornsbury, its state circuit court judge, whose nefarious activities dated from 2008. See Thornsbury Indictment returned August 14, 2013 in United States v.

5

<u>Thornsbury</u>, 2:13-cr-00208; Thornsbury Information filed September 19, 2013 in <u>United States</u> v. <u>Thornsbury</u>, 2:13-cr-00239, United States District Court, Southern District of West Virginia.

Thornsbury's cabal, named Team Mingo, consisted in substantial part of Mingo County officials and included Michael Sparks, prosecuting attorney, David Baisden, a county commissioner, and Dallas Toler, a magistrate, all of whom were convicted of federal crimes along with Thornsbury.  Team Mingo included Eugene Crum, a magistrate who resigned in order to run for sheriff and then served as a special investigator for the Mingo County prosecuting attorney, and who was elected as sheriff in November 2012, and assumed that office on January 1, 2013; it also included Rockel, a political ally of Crum. <u>See</u> Evid. Tr. 1/16/2025, James Smith, at 46-47.

Crum was assassinated on April 3, 2013, by an individual unrelated to Team Mingo, whereupon Crum's wife, Roseanna Crum, was appointed by the Mingo County Commission to succeed him as sheriff on April 4, 2013.  When Eugene Crum had come into office as sheriff in January of 2013, he appointed as his Chief Field Deputy, Rockel, a non-civil service appointee. Rockel continued to serve in that capacity through the tenure of

6

Ms. Crum, who, after a few months, resigned as sheriff in August 2013. Although Rockel retired from the Williamson Police Department on June 30, 2013, he continued as Chief Field Deputy until he was fired by the newly appointed sheriff, James Smith, whose appointment by the Mingo County Commission was effective September 16, 2013. One of Sheriff James Smith's first actions was taken on September 19, 2013, by firing Rockel, stating that Rockel was "No longer employed in the Sheriff's Department," with his last day on the payroll fixed as October 9, 2013. Defendant's Exh. 5. That was done by Sheriff James Smith in order to effectuate a fresh start for the Mingo County Sheriff's Office. See Evid. Tr. 1/16/2025, James Smith, at 55.

Eugene Crum owed $3,000 to George White for Crum's election campaign signs but wanted to avoid payment. Knowing that White was a petty drug dealer, Crum engaged a confidential informant to make a buy from White. The confidential informant bought three oxycodone pills from White, on the basis of which Crum and Rockel obtained a search warrant for White's business, the results of the execution of which are undisclosed to the court. See ECF 283-3,(Information). Rockel then appeared before the county grand jury to assist in obtaining an indictment against White on January 30, 2013. Id.

7

White was thought by Thornsbury to be cooperating with the FBI, doing so with the aid of White's then counsel, Charles West, which concerned Thornsbury, who conspired with others to encourage White to obtain new counsel, with the promise that Thornsbury would impose a lesser sentence on White, all in the hope of shutting off an FBI investigation. This resulted in the offense to which Thornsbury ultimately pled guilty and of which he was convicted in federal court.

As Chief Field Deputy, Rockel learned that Sheriff Roseanna Crum had made available the cell phone of Eugene Crum for inspection by FBI Special Agent Robert Cunningham, much to the dismay of Thornsbury. Rockel made it a point to express his displeasure to Roseanna Crum for her cooperating with the FBI authorities by asking her "[w]ere you satisfied with your decision to allow S/A Cunningham to create a copy of Eugene Crum's computer hard drive.". See ECF 283-7 (Summary of Interview of Roseanna Sue Crum).

When Rockel was interviewed by two FBI Special Agents, Joseph I. Ciccarelli and James F. Lafferty II, on August 29, 2013, he is reported as saying he felt that then Sergeant Joe Smith shouldn't be helping the FBI with their corruption investigation; and he agreed that he, "may have said that he

8

knew deputies were providing information to the FBI and that he 'would be at the top of the food chain soon.'  He also acknowledged he may have said 'if Joe wants to give documents to the FBI, see how he likes second shift.'"  Def. Exh. 3 at 4. The reference is to Sergeant Joe Smith who was a Mingo County deputy known to be cooperating with the FBI.  At the evidentiary hearing, Rockel denied that he had made either of those quoted statements.  See Evid. Tr. 1/30/2025, Carl David Rockel, at 104. The court credits not Rockel but the FBI interview statements quoted above which are consistent with the following statement of Roseann Crum on October 3, 2013, to Assistant United States Attorney Steven Ruby and three other AUSAs as well as the same two FBI agents, and FBI Special Agent G. Robert Cunningham:

> Rosie Crum submitted that when she was the Sheriff of Mingo County, West Virginia, Rockel approached her and complained about Mingo County Deputy Sheriff Joe Smith getting copies of Mingo County Sheriff's Department reports on behalf of Agents from the FBI.  Crum specifically stated that Rockel wanted to know 'Why are you (Smith) being a runner for the FBI.'  Crum confirmed that she asked Smith about the allegations and he confirmed that he has been providing the FBI with any documents they needed.  Crum related that she did not have any problem with Smith's actions.

See ECF 283-7 (Summary of Interview of Roseanna Sue Crum).


        Several months after Rockel was dismissed as Chief Field Deputy, it was learned that he had retained possession of

9

a number of files of criminal cases, together with items of
evidence pertaining to some of those cases.  These files would
have largely developed prior to the tenure of Eugene Crum as
sheriff, but did include evidence in the George White case.
After his dismissal, Rockel inexplicably kept those files in his
garage, when they should have been in the hands of the sheriff's
office or the prosecuting attorney or the FBI.  See Evid. Tr.
1/16/2025, James Smith, at 52.  Rockel turned these files over
to Sheriff James Smith on February 24, 2014.  Def. Exh. 4.  On
that same date, the charges against George White were dismissed.

        As a result of his Team Mingo role, Rockel was the
subject of a civil suit by Donald Ray Stevens and Ruby Stevens
against Thornsbury, Sparks, Rockel, and the City of Williamson,
filed in the Circuit Court of Kanawha County, West Virginia, on
October 30, 2013.  The gist of the case was that of a conspiracy
by the defendants to frame the plaintiff Donald Ray Stevens, a
private investigator, for the possession of an illegal wiretap,
all resulting from Thornsbury's fear that Stevens was spying on
him to expose Thornsbury's extramarital affairs.  Rockel's role
was alleged to have been that of executing an unlawful search
warrant issued by Magistrate Toler, and then, based on known
falsehoods, swearing out a criminal complaint against Stevens,
who was forced to enter into a diversion agreement that

10

compelled him to abandon his private investigation business to avoid prosecution.  At his August 29, 2013, interview with the FBI agents, Rockel admitted that he "took part in a discussion regarding the non-prosecution agreement for STEVENS."  Def. Exh. 3 (FBI 302 interview at 2). The suit was settled by payment of $10,000 on behalf of the City of Williamson.

Another civil suit was filed March 28, 2014, in the Circuit Court of Mingo County, West Virginia, by George White against Sparks, Baisden, Rockel, and the City of Williamson with respect to the matters earlier noted herein respecting White, who was incarcerated for nine months during which he entered into a plea agreement resulting in his conviction that was later set aside and vacated.  Still another lawsuit was filed in the Circuit Court of Kanawha County on September 9, 2016, by Albert W. Childress, III, against Thornsbury, Sparks, Mingo County Commission, and Rockel relating to Team Mingo that had led Childress to involuntarily plead guilty to a charge of attempted possession of a controlled substance from which he was later relieved by court order on September 14, 2015.  Each of these two civil cases was dismissed by order reflecting compromise and settlement by the parties who were represented by attorneys from the five law firms appearing in each case.

On or about August 26, 2013, Rockel received a target letter from the United States' Attorney's office informing him that he was the subject of a federal investigation with respect to which there was substantial evidence linking him to the commission of a federal crime.[1]  Def. Exh. 6; Evid. Tr. 1/30/2025, Carl David Rockel, at 81, 86.

Rockel contacted his attorney, Brian Abraham, at his office in Logan, West Virginia.  His attorney contacted the United States Attorney's office and, according to Rockel, Mr. Abraham advised him that they were not interested in Rockel but in others.  Id., at 87.  The court, in view of the terms of the Proffer Agreement set out below, does not accept or find credible the hearsay statement attributed by Rockel to Mr. Abraham.

The Proffer Agreement shows that it was signed by Steven Ruby, Assistant United States Attorney; Brian Abraham, as

---

[1] The referenced target letter marked and admitted as Def. Exh.6 at the evidentiary hearing on January 30, 2025, during which Rockel testified, is simply a generic form target letter.  The original target letter, which was not available due to being purged in keeping with the Department of Justice's practices, and which Rockel would have received, contained the assertion by the United States Attorney that Rockel was the subject of a federal investigation with respect to which there was substantial evidence linking him to the commission of a federal crime.  See Evid. Tr. 1/30/2025, Carl David Rockel, at 66, 67.

counsel; and Rockel; with the date of the signature of each
shown separately as August 29, 2013.  Def. Exh. 2.  The Proffer
Agreement states at the outset that Rockel "is a subject of a
federal investigation ...[T]he parties have agreed to meet for a
review of the evidence by the United States and to receive a
proffer by Mr. Rockel ...."  The terms of the Proffer Agreement
indicate that it was executed prior to the interview.  It was
followed by the interview of Rockel by the same two FBI agents
first named above, which occurred that same date in the office
of Mr. Abraham who was present.  Def. Exh. 3.  The two FBI
special agents, Ciccarelli and Lafferty, wrote up a 5-page 302
"Official Record" of the interview on January 2, 2014, which
begins:  "The following topics were covered."  Id.  Also present
were two state police troopers, Captain David M. Nelson, and
Sergeant Anthony S. Perdue, who arrived halfway through the
interview but asked no questions.

      The target letter to Rockel came on August 26, 2013,
at the time of a flurry of federal indictments of Team Mingo
participants.  Def. Exh. 1.  Thornsbury had been indicted on
August 14, 2013.  Baisden had been indicted on August 15, 2013.
The Indictments of Toler and Sparks would soon follow on October
9, 2013.

As earlier noted, the target letter stated that Rockel was the subject of a federal investigation and that substantial evidence linked him to the commission of federal crimes. Rockel engaged an attorney and entered into the Proffer Agreement with the United States Attorney's office in which he agreed to make a proffer that "will involve plea discussions" and further agreed as follows:

> [I]f Mr. Rockel ... offers evidence at trial either by calling witnesses, offering evidence, cross-examining government witnesses, or ... contradicts the information provided during his proffer interview, the United States may offer the statement of the defendant.

Def. Exh. 2. Reference to the "defendant" is doubtless a reference to Rockel. According to § 9-11.151 of the United States Attorney' Manual (1997), now known as the Justice Manual (2018), a "target" is a "putative defendant" as to whom "the prosecutor or grand jury has substantial evidence linking him or her to the commission of a crime."

In addition, the Proffer Agreement provides:

> [H]is statements may become admissible even if he chooses not to take the stand and offer testimony in his own defense ..."

Def. Exh. 2. The interview concluded on August 29, 2013. Rockel was not charged with a federal crime.

14

Juror Voir Dire

1. Law Enforcement Employment


On March 21, 2023, prospective jurors were called for the trial in the underlying criminal action, and during voir dire, the prospective panel was asked:

Court:   Have you, or any member of your immediate family, ever been employed as a law enforcement officer in any capacity?

The response included the following exchange:

Rockel:  I'm a retired police chief for the City of Williamson, Mingo County, West Virginia.

Court:   And how long did you serve in that capacity?

Rockel:  As chief — I served two years as chief. Prior to that, I came up through the ranks, started as patrolman, and made sergeant, lieutenant, and later became chief.

Prior to that, I worked for Lee County Sheriff's Department in Fort Myers, Florida, as a deputy sheriff there. Prior to that, with the Logan Police Department, in Logan County, West Virginia.

Court:   How long have you been a police officer?

Rockel:  33 years.

Court:   And retired now?

Rockel:  Yes, sir, I am.

15

```
Court:   Thank you.  Would that experience have
         any bearing upon your ability to serve
         as a fair and impartial juror in the
         trial of this case?

Rockel:  No, sir.  No. sir it wouldn't.

Court:   Thank you.
```

Tr. Voir Dire, at 26.

The court returned to law enforcement employment, providing the opportunity to any juror wanting to answer it differently to do so, with the following:

```
Court:   Ladies and gentlemen, to go over that
         same question again, by law enforcement
         officer, I'm speaking about anyone who
         may have served in a position of law
         enforcement as a West Virginia State
         trooper, as a deputy sheriff, as a
         member of any city or municipality
         police department, or served with the
         Drug Enforcement Administration.

         So having that broader area, including
         even military police, I will ask the
         same question.  And I would simply ask,
         if there are any who want to answer it
         differently, to raise your hands.

         And so, with that, let me ask the
         question first of all of you, and then
         we'll go back because I have two or
         three hands already up.

         With that broad definition of law
         enforcement officer, you, or any member
         of your immediate family, ever served as
         such under that broader definition?
```

Id. at 30.

16

There was no positive response from Rockel and again, no mention by him of his Chief Field Deputy service with the Mingo County Sheriff's Department in 2013.

Mr. Rockel was later brought individually before the court for questioning outside the presence of the other prospective jurors:

> Mr. Carrico (Counsel for the defendant):
> Q.    Sir, I just have a few follow-up questions, really based on the extent of your employment and previous law enforcement experience
>
> In your years as — were you the Chief of Police for a period of time?
>
> A.    Yes, sir.  I was the Chief of Police there.  I also headed up the drug task force between Mingo County and our department and several other departments.
>
> x x x
>
> Q.    And what was the name of the task force at the time?
>
> A.    Well, we didn't have — it wasn't — it was an unnamed task force.  It wasn't one, per se, that's been sponsored by the state.  It was a volunteer type task force that we would pull members from that work different areas of the county.
>
> Q.  What years?
>
> A.    Shoot — a lot of years, a long time.  Let's see — up until 2013, when I retired.

17

Q.    And were you doing the drug
investigation work up until that time?

A.    Yes. Yes, sir.

Q.    And what — what police agencies
did you work with?

A.    West Virginia State Police,
worked with DEA some, and worked with,
of course, our department, the 119 Task
Force in Logan, Delbarton City Police,
Matewan City Police, Gilbert City
Police, Mingo County Sheriff's
Department.

<u>Id.</u> at 104, 105.

In the colloquy above, once again Rockel refers to

"2013" when I retired," avoiding mention that he actually

retired when he was fired in September, 2013. Rockel was then

asked by Mr. Carrico about his experiences with confidential

informants following which that examination concluded with:

Q.    Would that experience in any way
affect your ability or affect you or
permit you from being impartial in this
case in determining the issues?

A.    No.  I don't think that it would.
If anything, it would probably enhance
whether they've done right or done
wrong.

<u>Id.</u> at 105.

18

## 2. Conflict, Controversy, Litigation

Further, during voir dire, the court inquired of the prospective jurors if they have had any conflict controversy or litigation with respect to certain government agencies as follows:

> Court:   Ladies and gentlemen, are you, or – have you, or any member of your immediate family, ever been involved with any conflict, controversy, or litigation with any department or agency of the United States, whether it's the United States Attorney's Office or any other agency of the government of the United States?
>
> Prospective Jurors:  No.

Id. at 66.  More particularly, there was no positive responses from Rockel.

## 3. Evaluation

When Rockel answered that he was a retired Chief of Police, the answer was truthful though misleading.  On follow up by the court, his response was truthful that he served the City of Williamson and, prior to that, at Fort Myers, and Logan – but misleading.  Both answers failed to mention his last employment was that of Chief Field Deputy for the Mingo County Sheriff's Department, a position from which he was fired.

When later examined by defense counsel out of the
presence of other jurors, Rockel related his service as the head
of an informal voluntary task force derived from various police
agencies active in Mingo County and named eight such agencies
that he "worked with," which included the Mingo County Sheriff's
Department.  Once again, no mention by Rockel that he was the
Chief Field Deputy for the Mingo County Sheriff's Department.
By virtue of his answers, he shielded himself from any questions
related to a most embarrassing period in his life that reached
its peak in August, 2013, and culminated in his mid-September,
2013 firing.

Later in the Juror voir dire, the court asked the
conflict, controversy or litigation question to which
Rockel and all Jurors answered "No."  Id. at 66.  While Rockel
now contends that he had no dispute or disagreement with the
United States or the United States Attorney's Office and that
there was no conflict or controversy with them, the court finds
that a controversy did exist as a result of Rockel being named a
target in a federal investigation in which the United States
Attorney asserted in a target letter addressed to Rockel that
"an investigation has uncovered substantial evidence linking you
to the commission of a federal crime."  Def. Exh. 6.  As noted,
Rockel quickly engaged an attorney, entered into the Proffer

20

Agreement that acknowledged he may stand trial as a defendant and agrees to plea discussions, following which he then submits to an interview by the two FBI agents in an effort to counter the government's assertion of substantial evidence linking him to the commission of a federal crime.

The term "controversy" is defined in Webster's Third New International Dictionary (2002) as:

```
1a:       the act of disputing or contending
1b(1):    a cause, occasion, or instance of disagreement
          or contention;  a difference marked esp. by
          the expression of opposing views:  Discussion,
          Dispute, Debate
1b(2):    Quarrel, Strife
2:        a suit in law or equity.
```

The controversy raised by the government's contention was successfully disputed by Rockel and he was not formally charged with a crime.  Rockel's answer of "No" to the court's controversy question was not true.  Once again, his answer was designed to avoid revelation of the tumultuous period in his life when in August 2013, he received the target letter and entered into the Proffer Agreement and the interview by two FBI agents and was promptly fired as Chief Field Deputy three weeks later by the newly appointed sheriff.  All of those extraordinary events were followed by the three civil suits

noted above, the first filed on October 30, 2013, the second filed March 28, 2014, and the third filed September 9, 2016, and the last one not resolved by settlement order until August 7, 2017.

At the evidentiary hearing on January 30, 2025, Rockel was asked by the defendant's attorney and answered as follows:

> Q.    I mean, if you're the subject of an investigation, a target of an investigation, I mean, wouldn't you be in conflict or controversy with the person trying to investigate you?
>
> A.    At that time — that was 12 years ago — almost 12 years ago that that happened.  And I'll be honest with you, I didn't think of it.  I forgot about it.  I just — I didn't remember it.  Because, yes, I'd see — I can see where that would probably be important.  But I just never thought about it.
> I gave honest answers at that time to what I thought was being asked.

Evid. Tr. 1/30/2025, Carl David Rockel, at 81, 82.

The court does not credit Rockel's answers that, at Juror voir dire, he "didn't think of" those events that occurred in August, 2013, that he "forgot about it", he "didn't remember it," he "just never thought about it."  It may have been 9 ½ years later when Rockel was questioned on voir dire on March 21, 2023, but the turbulent events faced by him in August 2013,

culminating in his firing three weeks hence, followed by the three civil suits, the last of which was not resolved until four years later, would remain etched in the mind of an intelligent individual such as Rockel.

The question remains as to whether the juror's misleading answers respecting his law enforcement employment and his untrue answers respecting any controversy with the United States Attorney's Office can be said to affect the juror's impartiality and, in turn, the fairness of the trial. McDonough, 464 U.S. at 556.

In evaluating that issue, the court considers the inquiry made of Rockel and credits his answer at the evidentiary hearing when asked whether he was biased in favor of the prosecution at the trial due to the United States not prosecuting him, to which he responded:

> No. No. That -- I didn't wake up that day and think, well, you know what, I think I'm going to go to federal court and put somebody in jail.  I didn't want to be here.
>
> I know it's my civic duty, and seeing how they taught me, I thought sure with me telling you or telling the Court me being a police officer and involved in drug work and task force and things like that, surely, I would not be picked.  I would not be picked. But they did.  And I was stuck here.  I didn't want to be here.

23

> But I did my civic duty, and I did what I
> thought was right at that time.

Evid. Tr. 1/30/2025, Carl David Rockel, at 113.  When asked

whether he was biased against the United States Attorney's

Office, Rockel responded:

> No.  I just — I was leery of them.

Id at 119.


### III. Conclusions of Law

Juror impartiality is commanded by the Sixth

Amendment:

> The Sixth Amendment . . . affords an accused
> the right to trial by an impartial jury. As
> the Supreme Court has observed, a touchstone
> of a fair trial is an impartial trier of
> fact -- a jury capable and willing to decide
> the case solely on the evidence before it.

Conaway v. Polk, 453 F.3d 567, 582 (4th Cir. 2006) (citations

and quotations omitted).  In light of the realistic human

intricacies and imperfections present in the voir dire process,

the Supreme Court has also opined that "[a] trial represents an

important investment of private and social resources, and it ill

serves the important end of finality to wipe the slate clean

simply to recreate the peremptory challenge process . . . ."

McDonough, 464 U.S. at 555.

In determining whether a new trial is warranted pursuant to Rule 33 of the Federal Rules of Criminal Procedure due to juror bias in this case, the relevant inquiry is two-fold, consisting of an actual bias analysis and an analysis under McDonough.  See Porter v. White, 23 F.4th 322, 327 (4th Cir. 2022); see also Porter v. Zook, 898 F.3d 408, 422 (4th Cir. 2018) ("The two are 'distinct' because while a McDonough claim requires a showing of juror misconduct, an actual bias claim may succeed regardless of whether the juror was truthful or deceitful.") (internal quotations and citations omitted). First, the court must ascertain whether actual bias existed as to Rockel.  White, 23 F.4th at 327.  If actual bias is found, the inquiry stops, and a new trial must be granted in the interests of justice.  See Id.; United States v. Carpa, 271 F.3d 962, 967 (11th Cir. 2001) ("If a court determines there was actual bias, the juror's inclusion in the petit jury is never harmless error.") (citing McDonough, 464 U.S. at 556).  If no actual bias existed, the court employs the McDonough test.  The court first considers whether any actual bias existed as to Rockel.

A.    Actual Bias

The Fourth Circuit has articulated "actual bias" in the context of juror claims when "a juror, because of his or her

25

partiality or bias, was not capable and willing to decide the case solely on the evidence before [them]." <u>Zook</u>, 898 F.3d at 423 (quoting <u>Smith v. Phillips</u>, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)) (internal quotations omitted). Alternatively stated, if a juror is incapable of impartiality, the juror is actually biased.  <u>White</u>, 23 F.4th at 327.

Where actual bias may be found, an evidentiary hearing on the same is appropriate.  <u>See</u> <u>United States v. Johnson</u>, 954 F.3d 174 (4th Cir. 2020); <u>Zook</u>, 898 F.3d at 439.  An evidentiary hearing was held here, giving defendant the opportunity to elicit from Rockel any indication of bias.

The prevalent question at this juncture is whether Rockel possessed a level of bias -- such that he was incapable of impartiality -- with respect to a criminal case brought by the United States Attorney's Office for the Southern District of West Virginia due to his contact with them in 2013.

Defendant contends the government conferred a "benefit" onto Rockel when it did not prosecute him for his alleged role on Team Mingo, and thus, Rockel was indebted to them for receipt of such benefit.  Def.'s Reply, ECF No. 285 at 6–7.  In the evidentiary hearing, Rockel was directly asked

whether this was the case, to which he replied, as would many prospective jurors, that he "didn't want to be here," but knew "it's my civic duty."  Further, he thought that being "a police officer and involved in drug work and task force . . . that, surely, I would not be picked."  See supra, at 23-24.

It is conceivable Rockel maintained some modicum of gratitude toward the government for declining to prosecute the case against him nearly ten years before defendant's trial.  It is just as conceivable that Rockel maintained some modicum of disdain toward the government for its treatment of him regarding a situation in which he says he had done nothing wrong.  There is nothing in the record which indicates either is the case for purposes of actual bias.  Indeed, Rockel's responses at the evidentiary hearing indicate, if anything, indifference.  The court concludes that actual bias has not been shown.

B.   McDonough Claim

Finding no actual bias with respect to Rockel, the court turns to defendant's McDonough claim.  First, it matters little whether the juror's incorrect response in voir dire was an honest mistake, deliberate concealment, or innocent non-disclosure -- the McDonough test applies equally.  Jones v. Cooper, 311 F.3d 306, 310 (4th Cir. 2002).  The Fourth Circuit has recently framed the

following inquiry, based on <u>McDonough</u> and related circuit
precedent:

> To succeed on a <u>McDonough</u> claim, a
> litigant must demonstrate that (1) a juror
> failed to answer honestly a material question
> on voir dire and (2) a correct response would
> have provided a valid basis for a challenge
> for cause. Even when a litigant makes this
> showing, however, a juror's bias is only
> established under <u>McDonough</u> if the juror's
> motives for concealing information or the
> reasons that affect the juror's impartiality
> can truly be said to affect the fairness of
> the trial . . . . [W]e have made clear that
> the inquiry into whether a trial's fairness
> was affected essentially constitutes a third
> part of the <u>McDonough</u> test.

<u>White</u>, 23 F.4th at 331 (internal citations and quotations
omitted) (citation modified). In this context, consistent with
the high court's default reverence for finality, "the bar for
juror misconduct is set high." <u>Zook</u>, 803 F.3d at 697.

1. Prong One

For reasons discussed at length in the Findings of
Fact above, the court is satisfied that Rockel "failed to answer
honestly a material question on voir dire." Rockel was
unequivocally involved in a controversy with the United States
Attorney's Office, and his failure to answer the correlated voir
dire question amounted to nothing less than concealment. The
calamitous events of 2013 were surely on Rockel's mind during
voir dire. The question was material inasmuch as an affirmative

answer to the inquiry could have led to a challenge for cause, the validity of which is next to be considered. Thus, the first prong of the McDonough test is satisfied.

### 2. Prong Two

Regarding the second prong, the question amounts to a retrospective hypothetical -- whether a truthful response from Rockel would have provided a valid basis for a challenge for cause. United States v. Fulks, 454 F.3d 410, 432 (4th Cir. 2006) ("[Defendant] failed to satisfy the second part of the McDonough test (that a correct response would have provided a valid basis for a challenge for cause) because the court would not have excused [juror] for cause even if she had fully answered Question 42.)"; Porter v. Gilmore, 479 F. Supp. 3d 252, 300 (E.D. Va. 2020), aff'd sub nom. White, 23 F.4th at 322. Here, if Rockel had been completely transparent during voir dire, disclosing his past controversy with the United States Attorney's Office and all the associated events, the court would not have stricken Rockel for cause, given the court's Findings of Fact and his repeated assurance that he could serve as an impartial juror.

"To the extent that the federal standards governing challenges for cause are implicated, the category of challenges

29

for cause is limited, and traditionally, a challenge for cause is granted only in the case of actual bias or implied bias (although a third category, inferred bias, might also be available).  See United States v. Torres, 128 F.3d 38, 43 (2d Cir.1997)[2]."  Cooper, 311 F.3d at 312 (4th Cir. 2002) (citation modified); see also Polk, 453 F.3d at 586.

As earlier stated, a juror's actual bias hinges on actual, evidenced partiality, and Rockel is not shown to have been actually biased.  Any other theory of bias hinges on a juror's substantial potential for partiality.  See Fulks, 454 F.3d at 432 ("The doctrine of implied bias is a principle limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.") (quotations omitted); Conaway, 453 F.3d at 586 ("The bias of a prospective juror may be actual or implied; that

---

[2]  The Second Circuit has recognized the category of "inferred bias."  See U.S. v. Torres, 128 F.3d 38, 47 (2d Cir. 1997) ("Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias.").  For the reasons stated herein, the court finds any "risk of partiality" would not have been "sufficiently significant to warrant" Rockel's excuse for cause.

is, it may be bias in fact or bias conclusively presumed as [a] matter of law." (quoting United States v. Wood, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936)).  Examples where bias is implied include "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."  Smith v. Phillips, 455 U.S. 209, 222, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) (O'Connor, J., concurring).  The instant case is far removed from any of these examples.

Again, it is conceivable, as defendant contends, that Rockel felt an obligation to confer some benefit to the government as it had long before provided some benefit to him in the form of non-prosecution.[3]  Though, it is just as conceivable the opposite is true.  Cooper, 311 F.3d at 313 ("[W]here juror lied about being accused of felonies and convicted of misdemeanors on her questionnaire and during voir dire, the

---

[3]  The defendant relies on this court's ruling in Lecco, a case that is readily distinguishable from this one.  In Lecco, the court granted defendant's motion for a new trial after a McDonough analysis.  See U.S. v. Lecco, 634 F. Supp. 2d 633, 663 (S.D.W. Va. 2009).  The Lecco juror in question was found to be under a pending, though dormant, federal investigation during his service as a juror in the defendant's trial.  Id. at 650.

juror's previous brushes with the law would create a stronger opposite inference -- one that she might well be biased in favor of defendants in general.") (quotations omitted).  Indeed, when asked if he were biased against the United States Attorney's Office, Rockel answered in the negative but stated he was "leery of them."  See supra at 24.

Had Rockel been wholly transparent during voir dire, defendant may have challenged for cause.  The court is satisfied, however, that the challenge for cause would have been denied.  The undisclosed events, as surprising as they would have been, would not have revealed any patent or latent partiality.[4]  Defendant may have been more inclined to use a peremptory challenge on Rockel in light of such truthfulness, but this is not the proper inquiry.  The second prong of the McDonough test is not satisfied.

    3.   Prong Three

    Even if the court were convinced of the satisfaction of the first and second prongs, defendant must satisfy a third prong -- that is, "whether [the] trial's fairness was affected."

---

[4]  While the defendant asserts that "the presence of a biased juror is a structural error," see ECF No. 285 at 7 (collecting cases), the court finds no bias, and the assertion is moot.

32

White, 23 F.4th at 331; Polk, 453 F.3d at 585 ("Additionally, a litigant must show that the fairness of his trial was affected either by the juror's 'motives for concealing [the] information' or the 'reasons that affect [the] juror's impartiality.'") (quoting McDonough, 464 U.S. at 556).

        The record, viewed in its entirety, indicates that Rockel's motivation for failure to truthfully respond to the controversy question during voir dire was due to concern for embarrassment rather than some ulterior motive.  He thought he would not be picked to serve after relaying his history of law enforcement, including drug task force work.  The court concludes that this factor did not affect the fairness of the trial for purposes of the third prong.

        Moreover, before raising the notion of juror bias in this case, defendant moved for a new trial regarding certain trial events which he argued amounted to a miscarriage of justice.  See ECF No. 123.  The court, using the relevant legal standard, conducted an analysis of each of the grounds, rejecting them.  See ECF No. 165.  In doing so, the court also found, as it does here, overwhelming evidence of defendant's guilt which the court noted in that order.  Id. at 4–5, 15–16.

Accordingly, the court having found that defendant's Motion for Indicative Ruling on Motion for New Trial raised a substantial issue, but does not merit a new trial, the court further finds for the foregoing reasons that defendant's Motion for a New Trial, ECF No. 283, should be denied.  Inasmuch as defendant's Motion for Indicative Ruling on Motion for New Trial, ECF No. 193 (refiled by the clerk as ECF No. 213), seeks a new trial, and inasmuch as ECF No. 283 is a restated version of that motion, both motions for new trial are DENIED.

The Clerk is directed to forward copies of this order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

ENTER:  June 27, 2025

John T. Copenhaver, Jr.
Senior United States District Judge